UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

FOX NEWS NETWORK, LLC,                        :

                                   Plaintiff,    :

              - against -                      :

UNITED STATES DEPARTMENT OF              :
THE TREASURY,
                                                 :
                                   Defendant.
-------------------------------------------------------x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  11/26/2012
```

**<u>DECISION AND ORDER</u>**

09 Civ. 3045 (FM)

**FRANK MAAS,** United States Magistrate Judge.

              Plaintiff Fox News Network, LLC ("Fox") brings this action ("<u>Fox II</u>")
under the Freedom of Information Act ("FOIA"), 5 U.S.C. §§ 552 <u>et</u> <u>seq.</u>, in an effort to
secure from the United States Department of the Treasury ("Treasury") records relating to
the government's program of assistance to the American Insurance Group ("AIG").
Fox's requests mainly concern a March 2009 transaction whereby Treasury and the
Federal Reserve Board restructured their AIG assistance program.  Fox also seeks
records pertaining to AIG's payment of substantial bonuses to its employees after it had
received Troubled Assets Relief Program ("TARP") funds from Treasury.  After
negotiations between the parties, only 62 documents, comprising some 438 pages of
material, remain at issue.  Treasury seeks to withhold these documents, in whole or in
part, pursuant to FOIA Exemption 5, on the theory that they are subject to the deliberative
process privilege, the attorney-client privilege, or both.  Given the extensive record in <u>Fox</u>

<u>News Network v. U.S. Dep't of the Treasury</u>, 739 F. Supp. 2d 515 (S.D.N.Y. 2010) ("<u>Fox I</u>"), the parties have cross-moved for summary judgment in <u>Fox II</u> by means of letter-motions.[1]  For the reasons set forth below, both letter-motions are granted in part and denied in part.

I.      <u>Procedural and Factual Background</u>

        This case arises out of Fox's third FOIA request for documents concerning the federal government's intervention to prevent the collapse of AIG and other financial companies.  The first two requests, which I considered in <u>Fox I</u>, sought documents pertaining to a custodial agreement between Treasury and the Bank of New York, the government bailout of AIG and Citibank, and TARP's impact on the credit markets.  Those requests, and the governmental actions that preceded them, are discussed at some length in <u>Fox I</u>.

        The FOIA request in <u>Fox II</u>, which is dated March 13, 2009, was served only days after the 2009 restructuring and, insofar as relevant, focuses primarily on documents generated after November 25, 2008.  (<u>See</u> Decl. of Joseph J. Samarias, dated June 16, 2011 ("Samarias Decl."), ¶ 5 & Ex. B).  Among other items, Fox seeks records relating to any obligations that Treasury imposed on AIG in connection with the restructuring, AIG's use of public funds and any accountings therefor, Treasury-imposed restrictions or conditions on AIG's executive compensation and personnel benefits, and

---

[1]      The parties' letters to the Court, and the exhibits annexed thereto, have all been docketed.  (<u>See</u> <u>Fox II</u>, ECF Nos. 21-28).

Treasury's oversight of AIG's financial activities.  (Id. Ex. B).[2]  As with its prior requests, Fox requested expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E).  (Id. ¶ 4 & Ex. B).

On May 29, 2009, Treasury began to release, on a rolling basis, the non-exempt records responsive to Fox's request.  (Id. ¶ 14).  By July 31, 2009, Treasury had reviewed 10,280 records, and withheld certain pages in whole or in part pursuant to FOIA Exemptions 2 and 4 through 6.  (Id. ¶ 17 & Ex. Q).  As required by its regulations, Treasury also had referred certain potentially responsive records created by other federal agencies to those agencies for their processing and response.  (Id. ¶ 17) (citing 31 C.F.R. § 1.5(c)(2)).

In August 2009, Treasury provided Fox with an initial 102-page Vaughn Index[3] of withheld documents and disgorged an additional 43 pages of documents that it previously had withheld.  (Id. ¶ 18).  Following the issuance of Fox I on September 3, 2010, I directed Treasury to produce a revised Vaughn Index reflecting any changes required by that decision. (ECF No. 15).  The government complied with that directive in February 2011, (Samarias Decl. ¶ 20), after which Fox annotated the Index with its

---

[2]     Fox also sought documents relating to collateral calls issued to AIG, AIG's purchase of multi-sector collateralized debt obligations, and Treasury's retention of Davis Polk & Wardwell and Morgan Stanley to advise Treasury with respect to its transactions with AIG under the TARP program.  (Id.)

[3]     See Vaughn v. Rosen, 484 F.2d 820, 826-28 (D.C. Cir. 1973).

objections (id. ¶ 22; letter to the Court from Steven G. Mintz, Esq., dated May 5, 2011 ("Mintz May 5 Letter"), Attach. ("Annotated Vaughn Index")).

   In late March 2011, after securing AIG's consent, Treasury released an additional 3,513 pages of responsive records, most of which had been withheld under Exemption 4.  (Samarias Decl. ¶ 23 & Exs. R-T).  Treasury then provided Fox with a revised Vaughn Index that reflected the supplemental releases.  (Id. ¶ 24).

   By letter dated May 5, 2011, Fox moved for summary judgment with respect to 65 documents withheld by Treasury pursuant to FOIA Exemptions 4 and 5, 5 U.S.C. §§ 552(b)(4), (5).  (Mintz May 5 Letter at 3).  Thereafter, on June 16, 2011, Treasury released three records that it previously had withheld, in whole or in part, under Exemption 4.  (Samarias Decl. ¶ 27 & Ex. U).  Treasury then cross-moved for summary judgment with respect to the remaining 62 documents that it sought to withhold under Exemption 5.  Of those documents, 321 pages have been withheld in part, and 117 pages have been withheld in full.  (See letter to the Court from Ass't U.S. Att'y John D. Clopper, dated June 16, 2011 ("Clopper June 16 Letter"), at 1; Samarias Decl. ¶ 28 & Ex. A ("Revised Vaughn Index")).  Treasury claims that the deliberative process privilege applies to each of these records.  (See Revised Vaughn Index).  In addition, Treasury maintains that three of the records are properly withheld on the basis of attorney-client privilege.  (Id.)

On September 23, 2011, I directed Treasury to provide me with unredacted copies of the documents listed on its Revised <u>Vaughn</u> Index for <u>in camera</u> review.  (ECF No. 20).  In response, Treasury initially failed to produce the three documents for which attorney-client privilege had been claimed, reasoning that Fox had not challenged Treasury's assertion of privilege with respect to those documents.  (<u>See</u> letter from Mr. Clopper to the Court, dated September 26, 2011 ("Clopper Sept. 26 Letter") at 1).  At Fox's request, (<u>see</u> letter from Mr. Mintz to the Court, dated September 30, 2011 ("Mintz Sept. 30 Letter")), I instructed Treasury to submit the additional documents to me for <u>in camera</u> review.  Treasury complied promptly, but submitted a letter further contending that Fox had waived the right to challenge Treasury's attorney-client privilege assertion by failing to raise the issue in a timely manner.  (<u>See</u> letter from Mr. Clopper to the Court, dated October 3, 2011 ("Clopper Oct. 3 Letter"), at 1).

II.    <u>Discussion</u>

    A.    <u>Applicable Law</u>

    1.    <u>FOIA</u>

"[FOIA] seeks to permit access to official information long shielded unnecessarily from public view and attempts to create a judicially enforceable public right to secure such information from possibly unwilling official hands."  Envt'l Prot. Agency v. Mink, 410 U.S. 73, 80 (1973).  Under the statute, agencies must disclose their records upon request, unless they can show that the requested records fall within nine enumerated

exemptions.  See 5 U.S.C. § 552(b) (listing exemptions); Mink, 410 U.S. at 79.  These exemptions are "explicitly made exclusive."  Mink, 410 U.S. at 79.  Citizens may file a challenge to an agency's response to a FOIA request in a district court, which "shall determine the matter de novo [with] the burden . . . on the agency to sustain its action."  5 U.S.C. § 552(a)(4)(B).

As noted in Fox I, "summary judgment is the preferred vehicle for resolving FOIA cases."  739 F. Supp. 2d at 532.  "In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA."  Carney v. U.S. Dep't of Justice, 19 F.3d 807, 812 (2d Cir. 1994).  The agency can meet this burden through affidavits and declarations "giving reasonably detailed explanations why any withheld documents fall within an exemption."  Id.  Typically, the agency will submit a Vaughn index containing descriptions of the withheld documents, along with affidavits or declarations from relevant officials.  If the agency's submissions are adequate on their face, the district court may "forgo discovery and award summary judgment" to the agency, unless the plaintiff makes a showing of bad faith sufficient to impugn the agency's declarations, provides tangible evidence that an exemption claimed should not apply, or establishes that summary judgment is otherwise inappropriate.  Id. (quoting Goland v. CIA, 607 F.2d 339, 352 (D.C. Cir. 1978)).

In resolving a summary judgment motion in a FOIA case, a court must interpret the statute broadly in favor of public disclosure and construe any exemptions narrowly.  See U.S. Dep't of Justice v. Julian, 486 U.S. 1, 8 (1988); Grand Cent. P'ship, Inc. v. Cuomo, 166 F.3d 473, 478 (2d Cir. 1999).  All doubts should be resolved in favor of disclosure.  See Grand Cent. P'ship, 166 F.3d at 478.

2.    Exemption 5

Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5).  "The exemption incorporates all normal civil discovery privileges, including the deliberative process privilege, the attorney-client privilege, and the attorney work product privilege."  Nat'l Day Laborer Org. Network v. U.S. Immigr. and Customs Enforcement Agency, 827 F. Supp. 2d 242, 250 (S.D.N.Y. 2011) (internal citations and quotation marks omitted).  To qualify for protection under Exemption 5, a document must "satisfy two conditions:  its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it."  Dep't of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8 (2001).  In this case, the government relies on the attorney client and deliberative process privileges.

a.      <u>Attorney-Client Privilege</u>

Since this is a FOIA case, Treasury's attorney-client privilege claims are governed by federal law.  <u>See</u> Fed. R. Evid. 501 (privilege issues in federal question cases "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience").  Accordingly, to withhold a document or portion thereof based upon the attorney-client privilege, Treasury must show that the text at issue reflects "[i] a communication between client and counsel, which [ii] was intended to be and was in fact kept confidential, and [iii] made for the purpose of obtaining or providing legal advice."  <u>United States v. Constr. Prods. Research, Inc.</u>, 73 F.3d 464, 473 (2d Cir.1996).  The privilege is generally intended to "encourage clients to make full disclosure to their attorneys" to ensure the quality of subsequent legal advice.  <u>Fisher v. United States</u>, 425 U.S. 391, 403 (1976).  In the governmental context, "[a]ccess to legal advice by officials responsible for formulating, implementing and monitoring governmental policy is fundamental to 'promot[ing] broader public interests in the observance of law and administration of justice.'"  <u>In re County of Erie</u>, 473 F.3d 413, 419 (2d Cir. 2007) (quoting <u>Upjohn Co. v. United States</u>, 449 U.S. 383, 389 (1981)).

The attorney-client privilege protects only legal advice, not economic, business, or policy advice.  <u>Id.</u> (considering "whether the communications were made for the purpose of obtaining or providing legal advice, as opposed to advice on policy"); <u>see</u>

8

also <u>TVT Records v. Island Def Jam Music Grp.</u>, 214 F.R.D. 143, 144 (S.D.N.Y. 2003) ("[O]nly those communications related to legal, as contrasted with business, advice are protected.") (internal quotation marks omitted); <u>First Chicago Int'l v. United Exch. Co.</u>, 125 F.R.D. 55, 57 (S.D.N.Y. 1989) (noting that the "attorney-client privilege is more difficult to apply in the corporate setting"). Thus, advice about "risks or costs in terms of expense, politics, insurance, commerce, morals, and appearances" typically is not legal advice. <u>County of Erie</u>, 473 F.3d at 420.

The test for deciding whether a communication that contains both legal and non-legal advice is privileged is whether the "predominant purpose of the communication is to render or solicit legal advice." <u>Id.</u> Where that is the predominant purpose, other "considerations and caveats" are not severable and the entire communication is privileged. <u>Id.</u> Moreover, when the legal advice is "incidental to the nonlegal advice that is the predominant purpose of the communication," redaction may be appropriate to preserve the privileged information. <u>Id.</u> at 421 n.8. The predominant purpose of a communication cannot be determined merely "by quantification or classification of one passage or another." <u>Id.</u> at 420. Rather, the communication "should be assessed dynamically and in light of the advice being sought or rendered, as well as the relationship between advice that can be rendered only by consulting the legal authorities and advice that can be given by a non-lawyer." <u>Id.</u> at 420–21.

9

b.      Deliberative Process Privilege

The deliberative process privilege applies to materials that are part and

parcel of the process of internal agency decisionmaking.  N.L.R.B. v. Sears, Roebuck &

Co., 421 U.S. 132, 150 (1975) (privilege protects documents comprising part of a process

by which policies are formulated).  The main purpose of the privilege is to promote better

policymaking by encouraging candor in internal deliberations.  Klamath Water Users

Protective Ass'n, 532 U.S. at 8-9; Tigue v. U.S. Dep't of Justice, 312 F.3d 70, 76 (2d Cir.

2002).  Thus, the privilege typically protects memoranda, drafts, recommendations,

proposals, and other documents that reflect the opinions of their authors, rather than those

of the agency.  See Tigue, 312 F.3d at 76 (opinions, recommendations, and deliberations);

Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980)

("recommendations, draft documents, proposals, suggestions, and other subjective

documents which reflect the personal opinions of the writer").  In order to secure

protection under the deliberative process exception, however, the agency must show that

a document is both "predecisional" and "deliberative."  Grand Cent. P'ship, 166 F.3d at

482.

"A document is predecisional when it is prepared in order to assist an

agency decisionmaker in arriving at his decision."  Tigue, 312 F.3d at 80 (quoting Grand

Cent. P'ship, 166 F.3d at 482).  Although an agency need not "pinpoint" an exact

decision made in reliance on the document, it must show, ex ante, that the document

"related to a specific decision facing the agency."  Id.  This test is designed to distinguish predecisional documents from those that are "merely part of a routine and ongoing process of agency self-evaluation."  Id. (internal quotation marks and citations omitted); cf. E.B. v. N.Y.C. Bd. of Educ., 233 F.R.D. 289, 293 (E.D.N.Y. 2005) (distinguishing "policy oriented judgments" from "routine operating decisions").

To be deliberative, a document must actually be "related to the process by which policies are formulated."  Grand Cent. P'ship, 166 F.3d at 482.  Among the factors that may be considered in this regard are whether the document forms an essential link in a specific consultative process, whether it reflects the personal opinion of the writer rather than the policy of the agency, and whether, if released, it would inaccurately reflect or prematurely disclose the views of the agency.  Id.  Thus, Treasury must actually identify and explain the role that a given document has played in the decision-making process. See, e.g., Coastal States, 617 F.2d at 868 ("agency has the burden of establishing what deliberative process is involved, and the role played by the documents in issue in the course of that process").  Because deliberative documents reflect the "give-and-take" of agency decisionmaking, id. at 866, purely factual material is not covered by the deliberative process privilege.  Mink, 410 U.S. at 91.  Factual material that is severable "without compromising the private remainder of the documents" consequently must be released.  Id.

B.      Application of Law to Facts

      1.      Introduction

As noted above, all 62 contested documents have been withheld, in whole or in part, based upon the deliberative process privilege.  As to three of the documents, Treasury also relies on the attorney-client privilege.  I will turn to the attorney-client privilege issue first.  Unless otherwise indicated, all document numbers and unattributed quotes set forth below refer to the entries in Treasury's Revised <u>Vaughn</u> Index.

      2.      Contested Documents

          a.      Attorney-Client Privilege

              i.      Waiver

In its initial letter-brief, Fox failed to raise any challenge to Treasury's assertion of the attorney-client privilege with respect to certain of the withheld documents.  (<u>See</u> Mintz May 5 Letter).  Instead, Fox's letter focused exclusively on Treasury's withholding of documents under Exemption 4 and the deliberative process privilege under Exemption 5.  The only statement in its submission that even remotely referred to the attorney-client privilege appeared in the annexed Annotated <u>Vaughn</u> Index.  In that document, however, Fox referred to the attorney-client privilege only with respect to Document 3405-3412, as to which Fox merely stated, in a single sentence, that "the application [of the privilege] is not evident" from the portion of the document that was released or Treasury's Revised <u>Vaughn</u> Index description.

In its cross-motion, Treasury contended that, "[b]ecause Fox d[id] not challenge the withholding of . . . documents pursuant to the attorney-client privilege, the Court need not determine whether Treasury's invocation of the deliberative process privilege with respect to these documents is appropriate."  (Clopper June 16 Letter at 2). Accordingly, Treasury requested that summary judgment be granted with respect to the three documents withheld pursuant to the attorney-client privilege.  (Id.).

Over the next three months, Fox did not contest Treasury's claim of attorney-client privilege as to these documents.  (See Clopper October 3 Letter at 2). Subsequently, in September 2011, after I directed Treasury to submit the documents on its Revised Vaughn Index for in camera review, Treasury's counsel omitted the three alleged attorney-client documents, noting that its assertion of attorney-client privilege had not been challenged.  (Id.).  In response, on September 30, 2011, Fox alleged for the first time that it also was seeking review of those documents.  (See Mintz Sept. 30 Letter). Fox stated that it had expressly questioned the applicability of the attorney-client privilege in the comments section of its Annotated Vaughn Index.  (Id.).  While conceding that there was only one such reference in that submission, Fox maintained that to the extent that the other two documents incorporated comments from Treasury's outside counsel or outside auditor, it could not "know whether portions of the withheld documents are actually ineligible for the attorney-client privilege."  (Id. at 2).

13

By failing to assert an unambiguous challenge to Treasury's claim of attorney-client privilege until September 30, 2011, Fox arguably waived its right to seek review of the three documents.  See Nat'l Day Laborer Org. Network, 811 F. Supp. 2d at 738 (plaintiffs who chose not to challenge the defendants' assertion of FOIA exemptions "in the interest of efficiency" and "without conced[ing]" the sufficiency of the defendants' Vaughn indices and declarations nevertheless waived any argument that the exemptions claimed were improper).  There is no need to resolve the issue, however, because Treasury has sustained its burden of showing that the three documents fall within the scope of the attorney-client privilege.

ii.     Applicability of the Attorney-Client Privilege

Documents 3405-3412 and 3754-3757 are email threads from March 1, 2009, which relate to the preparation of a press statement to be released by AIG concerning the restructuring of the government's investments.  Treasury redacted an attached draft of the statement "contain[ing] handwritten interlineations of proposed changes," as well as comments in the body of the email chains discussing the content of the draft.  The redacted material, which was circulated among consultants at Morgan Stanley, Treasury's general and outside counsel, and Federal Reserve Bank of New York ("NYFRB") attorneys, reflects substantive discussion by and among the attorneys concerning the propriety of certain assertions in the draft statement and attached riders.  Thus, it is clear that the purpose of the emails was to obtain or provide legal advice.  The

14

redacted materials therefore were properly withheld pursuant to the attorney-client privilege.

Document 3778-3779 is a partially-withheld email thread in which Treasury personnel "seek[] legal analysis" from Treasury's counsel regarding proposed language about the AIG restructuring for use in AIG's Securities and Exchange Commission ("SEC") Form 10-K. A review of the unredacted text confirms that the redacted text reflects legal advice and discussion regarding the legal implications of the language proposed for inclusion in the Form 10-K. The attorney-client privilege thus has been asserted properly for this document as well.[4]

b.     Deliberative Process Privilege

Confirming the dramatic changes in communication that have occurred in recent decades, each of the remaining disputed documents takes the form of an email or email thread. Each of those documents was generated between February 6 and March 29, 2009. (See Samarias Decl. ¶ 32 & Ex. A). Further, most of the emails comment on drafts of documents intended for eventual public release and either include proposed language in the body or attach the actual drafts. The email discussions and drafts withheld by Treasury fall into five broad categories: (i) communications relating to a press statement

---

[4]     Because Documents 3405-3412 and 3754-3757 are properly withheld under the attorney-client privilege, they will not be considered further. Document 4554-4555, however, is a copy of Document 3778-3779, as to which Treasury has claimed only deliberative process privilege. (See Revised Vaughn Index). Although the Court reasonably could conclude that this was an oversight, I will in due course consider the document to determine whether it qualifies for withholding based on the latter privilege.

concerning the AIG restructuring that Treasury and the Federal Reserve Board issued on March 2, 2009; (ii) draft talking points and responses to possible questions ("Q&As") arising out of that statement; (iii) draft responses to actual press inquiries and media coverage; (iv) draft congressional relations materials; and (v) other miscellaneous communications.  (See id. ¶ 38; Mintz May 5 Letter at 4).  Not surprisingly, because Fox's FOIA request focuses on the restructuring announced on March 2, 2009, the majority of these records were created during the period immediately preceding that announcement. (Samarias Decl. ¶ 38).

In support of its deliberative process claims, Treasury has submitted the declaration of Joseph J. Samarias, Deputy Chief Counsel for Litigation and General Law in Treasury's Office of Financial Stability.  (Samarias Decl. ¶ 1).  In his declaration, Samarias contends that the 62 records withheld or redacted by Treasury are exempt from disclosure because each was part of an exchange of ideas and suggestions that was necessarily part of the decision-making process and reflects Treasury staff members' preliminary assessments regarding the issues under consideration.  (Id. ¶ 44).  According to Samarias, disclosure of these types of records would "severely hamper the efficient day-to-day work of Treasury" by impairing agency officials from engaging in the free exchange of ideas necessary for efficient and proper decisionmaking.  (Id. ¶ 45).  Annexed as an exhibit to the Samarias Declaration is the Revised Vaughn Index, which incorporates certain boilerplate general justifications for the withholding or redaction of particular documents, but also furnishes some additional descriptive details.

16

Fox does not challenge Treasury's determination that the contested records qualify as inter or intra-agency documents within the meaning of Exemption 5.  Fox nevertheless contends that the information furnished by Treasury is insufficient to establish the applicability of the deliberative process privilege because the descriptions provided by Treasury are vague and conclusory and do little more than raise boilerplate objections tracking the language of Fox I.  (Mintz May 5 Letter at 4).  Fox objects further that both the context and the unredacted portions of the documents show that the information being withheld by Treasury is neither predecisional nor deliberative.  (Id. at 5).

Fox is correct that the Revised Vaughn Index and Samarias Declaration, by themselves, are insufficient to support Treasury's claims.  See Military Audit Project v. Casey, 656 F.2d 724, 738 (D.C. Cir. 1981) ("[S]ummary judgment on the basis of . . . agency affidavits is warranted if the affidavits describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record [or] . . . evidence of agency bad faith.").  Here, however, Treasury has also provided the Court with copies of the contested records for in camera review.  My review of those documents informs the discussion that follows and permits rulings to be made with respect to the disputed claims.  Those rulings are as follows:

i.      Records Relating to March 2, 2009 Press Release

Thirty-three of the contested documents in the Revised <u>Vaughn</u> Index are email threads discussing, revising, and circulating drafts of a joint press release that was released in final form by Treasury and the Federal Reserve Board on March 2, 2009.[5]  In that press release, the two agencies disclosed  the federal government's plan to restructure its investments in AIG.  (Samarias Decl. ¶ 32 & Ex. V).[6]  That same day, Treasury also released a "Term Sheet" outlining the material terms and conditions of its proposed transaction with AIG.  (<u>Id.</u> ¶ 33 & Ex. W).

Treasury contends that because these records relate to drafts, the comments and proposed language that they contain are "inherently" predecisional and "part of the deliberative process" of creating a final document.  (<u>Id.</u> ¶¶ 40-41).  If Treasury's theory were to be accepted, <u>all</u> drafts of <u>all</u> agency documents would be protected simply because of their status as preliminary versions of final documents.  Contrary to Treasury's assertion, however, "the mere fact that a document is a draft is not a sufficient reason to automatically exempt it from disclosure."  <u>New York Times Co. v. U.S. Dep't of Def.</u>, 499

---

[5]      These documents are:  602, 757-763, 2230-2297, 2323-2440, 2450-2461, 2462-2470, 2738-2742, 2861-2862, 2863-2865, 2875-2877, 2968-2970, 3013-3014, 3044-3046, 3061, 3401-3404, 3476-3479, 3732-3734, 3772-3774, 4206-4207, 4222-4225, 4635-4646, 4896-4897, 4929-4936, 4937-4939, 4940-4944, 5247-5257, 5258-5272, 5890-5894, 8301, 8302-8303, 8305-8306, 8307-8315, and 8544-8546.

[6]      The press release is publicly available on the Federal Reserve Board's website.  "U.S. Treasury and Federal Reserve Board Announce Participation in AIG Restructuring Plan," (Mar. 2, 2009) http://www.federalreserve.gov/newsevents/press/other/20090302a.htm (last visited November 18, 2012).

18

F. Supp. 2d 501, 515 (S.D.N.Y. 2007) (quoting Lee v. FDIC, 923 F. Supp. 451, 458

(S.D.N.Y. 1996)) (internal quotation marks omitted); see also Nat'l Day Laborer Org.

Network, 811 F. Supp. 2d at 741 ("[A] draft is only privileged if it contains discussions

that reflect the policy making process.  It is not privileged if it reflects the personal

opinions of a writer with respect to how to explain an existing agency policy or decision.")

(superscript omitted).  The onus remains on the agency to furnish the Court with specific

information establishing that the draft is both predecisional and deliberative, by

explaining, for example, the "function and significance [of the draft] in the agency's

decisionmaking process."  New York Times Co., 499 F. Supp. 2d at 515 (quoting The

Wilderness Soc'y v. U.S. Dep't of the Interior, 344 F. Supp. 2d 1, 15 (D.D.C. 2004)).

       In its motion, Fox challenges Treasury's claim that the documents relating to

the March 2 press release are predecisional or deliberative in nature.  (Mintz May 5 Letter

at 4).  In particular, Fox focuses on certain descriptions in Treasury's Revised Vaughn

Index stating that the records reflect discussions about "how best to present Treasury's

position" concerning the AIG restructuring.  (Id. at 4-5 & Annotated Vaughn Index).  Fox

suggests that this description shows that the drafts were created after the substantive policy

decisions had been made and thus were post-decisional.  (See Annotated Vaughn Index).

Fox further argues that the description provided by Treasury indicates that the discussion

contained in the records focuses on packaging the agency's position for the public and,

therefore, does not concern the type of substantive policy deliberations that Exemption 5 is

intended to protect. (See Annotated Vaughn Index).

19

Treasury, however, has provided information sufficient for the Court to determine that the records relating to the March 2 press release are, in fact, predecisional. At the outset, the Revised <u>Vaughn</u> Index indicates, and the dates on the emails confirm, that each of the records at issue was created between February 27 and March 1, 2009, prior to the public announcement of the government's plans to restructure its investments in AIG.  According to the Samarias Declaration, the terms of that restructuring were being discussed in the emails and drafts, which were not fully finalized by March 2.  (Samarias Decl. ¶¶ 33-35).  Indeed, the negotiations between AIG and Treasury regarding the terms of the restructured investments continued for some six weeks following the announcement and resulted in significant changes in the final terms.  (<u>Id.</u> ¶ 35; Clopper June 16 Letter at 5).  These modifications included a $165 million reduction in a proposed $30 billion credit facility intended to offset the retention payments that AIG had made to its executives. (<u>See</u> Samarias Decl. ¶ 35; Clopper June 16 Letter at 5).  The final restructuring plan was not executed until April 17, 2009, over a month after the initial public announcement. (Samarias Decl. ¶ 34).

Whether the documents are deliberative is a question requiring closer examination.  To the extent that the disputed documents have been withheld on the ground that they reflect "how best to present Treasury's position," Treasury ignores this Court's rulings in <u>Fox I</u>.  In that decision, I noted that communications concerning how to present agency policies to the press or public, although deliberative, typically do not qualify as substantive policy decisions protected by the deliberative process privilege.  739 F. Supp.

20

2d at 545.  I further observed that the key consideration in deciding whether an agency's

internal discussions about packaging its views for presentation should be exempt from

disclosure under FOIA is whether it would be necessary to further the goal of promoting

sound decisions and policies by permitting agency officials to engage in frank discussions.

Id. at 544-45.  Drafts of public relations documents therefore may properly be withheld if

their release would reveal the status of internal agency deliberations on substantive policy

matters.  Id. at 547.

Applying these principles in Fox I, I found that the deliberative process

privilege was inapplicable to e-mails concerning press relations that "consist[ed] entirely

of . . . advice regarding 'messaging,'" or "relate[d] to the massaging of [the entity's]

public image."  Id.  On the other hand, I concluded that press release drafts that included

"placeholders in anticipation of [Treasury's] final decisions" and reflected "revisions in

light of ensuing changes in . . . proposed terms" would impermissibly "reveal how

Treasury's deliberations with respect to the underlying substantive policy progressed over

the course of several days."  Id.  Since disclosure would reveal alternatives that were not

chosen, and reasoning that might inaccurately reflect the ultimate rationale for a policy, I

held that those press release drafts need not be disclosed.  Id.

Having reviewed the unredacted documents in this case, I am satisfied that

the drafts of the March 2 press statement and accompanying email discussions fall into the

second category of public relations documents since their disclosure would reveal the

21

evolution of Treasury's thinking regarding the proposed restructuring of the AIG investments. These emails were circulated over the course of several days, from February 27, 2009, until the eve of the announcement. The initial drafts consist of straw paragraphs that served as a springboard for further discussion. Agency personnel also used the draft paragraphs to generate substantive questions about the developing policy, highlight issues yet to be addressed, and consider likely outcomes under proposed alternatives. In other words, the records reflect the "agency's group thinking in the process of working out its policy." See Sears, Roebuck & Co., 421 U.S. at 152.

It is significant that the final document that was under discussion took the form of a joint press statement. As the draft releases and related emails show, the Federal Reserve Board and Treasury initially crafted separate draft statements, which were shared and later combined into one statement. The unredacted documents also confirm that there were ongoing negotiations within each agency and between them concerning the content of the policy to be announced, whether the language accurately reflected that policy, and how the language itself might affect the contemplated transaction in the future. This kind of back-and-forth discussion to hammer out the details of a contemplated transaction and refine the message to reflect the agency's developing position accurately is precisely what the deliberative process privilege is intended to protect. Contrary to Fox's assertions, the privilege thus has been properly asserted with respect to the records relating to the preparation and issuance of the joint press statement.

ii.     Draft Talking Points and Q&As

Treasury also has withheld, in part, several emails containing drafts of talking points related to the March 2 announcement.  (These are documents are 2441, 2868-2873, 2986-2998, and 5258-5272.)  The drafts discuss the rationale for, and contemplated mechanics and potential impact of, the restructuring transaction.  According to Treasury, the draft talking points "do not reflect the agency's final policy positions on the proposed AIG restructuring."  Instead, like the drafts and emails concerning the press release, these documents were circulated before all the details and terms of the transaction were finally decided and predate the initial public announcement of the transaction.  Indeed, sections of the talking points were based on drafts of the press statement – which was itself continually evolving until the actual announcement was made.  Also, like the draft press releases, these documents include placeholders for policies and rationales that might not ultimately be adopted by the agency, and questions from drafters about the substance of the evolving policy.  These documents consequently are properly withheld for the same reasons as the drafts of the press release announcing the restructuring.

Document 505-506 is an email thread dated March 23, 2009, "circulating and providing opinions on draft questions and answers pertaining to AIG retention payments" for an unspecified "session" to be held the following morning.  According to Treasury, the redacted portions "reflect internal deliberations regarding what policies Treasury should adopt with respect to AIG's retention and bonus payments that were due

23

to be paid in April 2009." These emails were exchanged one month before the payments were due and therefore are predecisional. Although Treasury has not specified why this "Q&A" document was created, it has linked the email thread to a specific substantive policy matter: Treasury's response to AIG's announced plans to make retention and bonus payments. The draft reflects the drafter's individual understanding of the agency's proposed plans and modifies the stated rationale for Treasury's policies. The document also expresses the personal opinions of one writer regarding Treasury's response. Redaction of this document pursuant to the deliberative process privilege therefore was proper.

Document 1273-1351 is an email thread from March 17, 2009, "circulating for internal consideration opinions, recommendations, and advice" regarding "how to answer questions concerning [Treasury Secretary Geithner's] and Treasury's awareness of AIG bonus payments." Treasury has not indicated whether the questions concerning the Secretary's and Treasury's awareness were drafted internally or posed by an outside entity. The draft language and much of the accompanying discussions have been withheld by Treasury on the ground that they reflect deliberations about "AIG bonus payments conducted prior to Treasury's public announcements related to these payments." (Annotated Vaughn Index at 9-10). The proper focus of the inquiry, however, is not the date of Treasury's public announcement, but, rather, the date that the substantive policy decision was finalized. See Nat'l Day Laborer Org. Network, 811 F. Supp. 2d at 742 (quoting Judicial Watch, Inc. v. U.S. Postal Service, 297 F. Supp. 2d 252, 260 (D.D.C.

2004)) ("The most basic requirement of the deliberative process privilege is that a document be <u>antecedent</u> to the adoption of an agency policy.") (brackets omitted and emphasis in original).  The redacted portion of the document reflects agency officials' attempts to explain certain decisions that Treasury made when it first became involved with AIG in September 2008, as well as decisions made by the Secretary concerning the monitoring of AIG which may have affected his awareness of the bonus payments issue.  Treasury has failed to point to any later substantive policy decision that was furthered by this discussion, which simply rehearses past events.  Treasury also has redacted discussions of the timeline of when the agency became aware of the payments, including tentative dates that required confirmation.  These tentative dates are not alternate substantive policy choices occupying space in the draft until a final decision is made.  Rather, they are historical approximations that await confirmation.  Such factual material is plainly outside the scope of the deliberative process privilege.  <u>Mink</u>, 410 U.S. at 91.  Accordingly, because Treasury has failed to sustain its burden of showing that this document is predecisional and deliberative, it must be released in full.

iii. <u>Draft Responses to Press Inquiries</u>

Document 1112-1114 is an email thread among personnel at Treasury and the NYFRB forwarding a list of questions from ABC News ("ABC") about the government's oversight of AIG.  Through those questions, ABC sought information concerning AIG's use of federal funds, including information about any funds used to pay

25

AIG counterparties and creditors.  Treasury has redacted the recommendations of Sarah

Dahlgren, Senior Vice President of the NYFRB.  The redacted material, however, consists

almost entirely of factual information, such as where the data can be found and what the

agency previously had said publicly about the topic.  Since the Dahlgren text appears

merely to  relay a position that the agency had already disclosed, release of most of the

redacted material will not run the risk of misrepresenting the agency's policy regarding

AIG oversight.  Only the third redacted sentence in the Dahlgren email reflects her

personal opinions and recommendations regarding formulation of the agency's substantive

response.  Accordingly, this sentence may be redacted; the remainder of the document

must be released.

Document 1352-1366, dated March 2, 2009, is an email thread discussing

additional questions posed by ABC concerning the AIG restructuring announcement.

Treasury redacted part of an email from Michael Hsu, a senior Treasury economist, which

discusses a proposed response to a question regarding the allocation of the $150 billion

previously invested by the government in AIG.  The redacted information contains nothing

more than a factual explanation of how the funds were apportioned prior to the March 2

restructuring.  Furthermore, there is no indication that this recitation of past events relates

in any way to a future policy decision.   Accordingly, because Treasury has not sustained

its burden of showing that the document is either predecisional or deliberative, it must be

released in full.

Document 2301-2309 is an email thread, dated March 17, 2009,  detailing the chronology of "Treasury's responses to AIG executive compensation issues and discussing rationales."  These internal Treasury emails were prompted by a Wall Street Journal staff writer's request for information about "how the bonus situation unfolded." Treasury has redacted a timeline detailing the sequence of relevant events, explaining that it "was circulated to assist Treasury decisionmakers in their consideration of the proposed terms and conditions of what ultimately became the AIG restructuring transaction executed on April 17, 2009."   The redacted timeline appears in the body of an email from Andrew Williams, Treasury's Deputy Assistant Secretary for Public Affairs.  In the email, Williams solicits factual information from Treasury personnel and counsel to flesh out details "of what we knew and when."  The withheld timeline primarily chronicles past developments relevant to the executive compensation issue and explains and defends past actions taken by Treasury over the preceding several months.  Williams' email belies Treasury's assertion that Williams was providing background information to decisionmakers or seeking to develop a detailed chronology to assist in the formulation of new policy.  Additionally, although Williams copied a Treasury attorney on the email, it seems clear that his purpose in sending the email was to obtain accurate information for a journalist, not to seek legal advice from the agency's counsel.  And while the timeline may later have been used to give Treasury officials a common understanding of the events that led to the payment of the AIG executive bonuses, Treasury has failed to specify how that

played a role in the decisionmaking process.  For these reasons, the document cannot be withheld.

iv.    <u>Draft Congressional Relations Materials</u>

Document 487 is an email thread circulating recommendations by Treasury's Assistant Secretary for Legislative Affairs regarding the agency's response to an inquiry by Senator Robert Menendez.  The senator had asked how Treasury would evaluate the financial condition of AIG and whether AIG would be subjected to a "stress test."  Treasury argues that the redacted portions of the thread "contain[] a substantive policy discussion about possible future events," including a discussion of "issues raised in anticipation of the contemplated [federal government and AIG] Restructuring Transaction" and the "policies Treasury should adopt with respect to judging ranges of outcomes when assisting certain financial institutions."  (Revised <u>Vaughn</u> Index; Clopper June 16 Letter at 5).  Having reviewed the document, I find that the redacted text reflects the author's personal assessment of policy options that had yet to be implemented.  The deliberative process privilege thus was properly asserted as to this document.

Document 835-837 (and its duplicate Document 838-839) is an email thread circulating suggestions as to how to respond to Congressman Elijah Cummings's "inquiry regarding Treasury's future plans regarding the disposition of its holdings in AIG." Treasury asserts that the redacted information contains "a discussion of what position the agency should take."  Fox objects, noting that the questions from Congressman Cummings

in the released portion of the document are factual and historical in nature.  My own <u>in camera</u> review confirms that the document contains both exempt and nonexempt text.  The first three sentences in the third redacted portion of Michael Hsu's email dated February 13, 2009, explain a decision previously made by the agency in October 2008, and is segregable from the remainder of that redaction.  This information therefore must be released.  The remaining redacted text, however, reflects Hsu's personal opinions and recommendations, as well as his individual understanding of the rationale for current and upcoming adjustments to agency policies.  The deliberative process privilege shields this text from production.

Document 944-950 is an email thread containing comments and draft answers prepared by Treasury staff to help Secretary Geithner prepare for a Congressional hearing regarding AIG.  The document has been partially redacted.  Fox contends that a question on the released portion – which asks "Why didn't you let the derivatives counterparties take a loss and just protect the policyholders?" – suggests that the redacted answer relates to historical facts and thus is not predecisional.  (<u>See</u> Annotated <u>Vaughn</u> Index).  Treasury responds that the discussion is relevant not only to past events, but to Treasury's ability to implement ongoing aspects of the AIG restructuring transaction, as well as Congressional oversight of Treasury's AIG activities.   (Clopper June 16 Letter at 5).  The agency further maintains that the withheld portions reflect the personal suggestions of the author regarding the rationale for agency action and not the considered view of the agency.  (<u>Id.</u> at 6).  My <u>in camera</u> review confirms Treasury's assertions that

the explanation of past decisions contained in the redacted material is intertwined with the drafter's assessment of unfolding events with respect to the AIG restructuring and includes a discussion as to how Treasury might adjust its policies in the future.  This material is properly redacted.  Three redactions under the heading "Financial Services Prep Materials," however, are improper.  The redacted language merely identifies materials that must be drafted and assigns that task to particular Treasury officials.  This ministerial directive is not the sort of information that the deliberative process privilege is intended to protect.  Consequently, the itemized list must be released to Fox.

Document 955-975, an email thread circulated among Treasury staff on March 20, 2009, contains draft outlines for the Secretary's upcoming testimony before Congress and an "analysis of [a] media article concerning Goldman Sachs' exposure to AIG."  Treasury has redacted the draft outline, as well as portions of the document revealing Treasury "personnel's opinion concerning the accuracy of certain assertions" in the article.  The two topics do not appear to be closely related.  Turning first to the proposed testimony, Treasury has not shown that the materials relate to anything other than past events.  Moreover, there is no indication that the "public response" about which the author speaks involves policy action, rather than mere messaging.  In these circumstances, because the agency has not met its burden by showing that the discussion of the Secretary's speech is predecisional and deliberative, these aspects of the document are not entitled to protection under the deliberative process privilege.

The remaining portions of Document 955-974 simply reflect the personal views of two Treasury officials concerning a news report that day concerning Goldman Sachs.  In context, it seems clear that the authors of those emails are anticipating questions likely to arise out of the article and taking steps to formulate an agency response. Accordingly, unlike the aspects of the email relating to the speech, these communications are exempt from disclosure.

Document 5879-5881 is an email string, dated March 19, 2009, attaching and discussing a draft outline of the Secretary's upcoming testimony before the House Financial Services Committee regarding the bonus payments to AIG executives.  The final version of the Secretary's testimony was released on March 24, 2009.  Treasury redacted an attached draft outline and a summary of the outline set forth in the body of the email. According to Treasury, the redacted material concerned "proposed policy" and was prepared "to assist Treasury decisionmakers in analyzing possible approaches."  Fox disputes this characterization, contending that the document simply reflects a nonexempt effort to massage Treasury's image.  (See Annotated Vaughn Index).  The first two sections of the summary in the email merely chronicle past events and decisions. Accordingly, they must be produced.  The remainder of the summary and the outline pertains to current and future plans of the agency as to which either a decision had yet to be made or the justification had yet to be finalized.  Consequently, because no final

decision had been made with respect to these aspects of the document, they may be withheld as deliberative and predecisional.[7]

Document 1694-1695 contains a partially redacted "draft letter to Congress setting forth [a] proposed Treasury response to AIG employee issues." According to Treasury, "the withheld information consists of a statement that ultimately was not incorporated in the final document." This description is insufficient to warrant protection pursuant to the deliberative process privilege. The privilege is designed to protect deliberations on substantive policy, not discussions about how best to present the agency's position. Thus, a mere variance in the language ultimately chosen by the agency does not suffice to prevent disclosure, unless it would reveal an alternate policy that was not adopted. Here, Treasury's description fails to pinpoint the substantive policy matter as to which the redacted language is predecisional and deliberative. Moreover, an in camera review of the document confirms Fox's contention that the withheld information consists of only a "communication of Treasury's position, rather than the development of policy." (See Annotated Vaughn Index). Since Treasury has failed to meet its burden of showing that the document is predecisional and deliberative, it must be released in full.

Documents 2878-2885 and 3486-3491 are email threads discussing and attaching drafts of identical letters sent by Secretary Geithner to Senator Harry Reid and

---

[7]     Since the draft outline attached to Document 955-974 is apparently identical to the outline annexed to Document 5879-5881, it too must be released, in part, in the same manner.

Representative Nancy Pelosi.  The letters detail Treasury's response with respect to the bonuses paid by AIG to its employees.  Treasury has withheld the drafts as well as portions of the email commentary, contending that they reveal deliberation related to "certain AIG compensation issues."  Having reviewed the unredacted documents, I find that their disclosure would reveal the agency's deliberations as to substantive policy issues that had yet to be finally formulated or adopted.  The documents express the recommendations and opinions of Treasury personnel and consultants regarding the substantive steps Treasury should take in the future to monitor AIG, and contain individual assessments of proposed policy options.  It is evident from the documents that, before work on the drafts began, no firm decision had been made as to the approach Treasury would take concerning the executive compensation issue.  Indeed, many of the proposals and rationales set forth in the draft documents ultimately were deleted from the final document sent by the Secretary.  The release of such materials would disclose an inaccurate representation of the agency's ultimate policy and contravene the purpose of the deliberative process privilege by stifling honest and frank communication among agency officials.  As such, these documents are exempt from release.

v.    <u>Other Documents</u>

Document 507-508 is an email thread among senior Treasury staff "circulating and providing opinions on draft questions regarding the restructuring of AIG . . . in order to assist Treasury official(s) for testimony and on background."  Treasury

33

asserts that these communications discuss the "potential for and consequences of an AIG bankruptcy."  Fox contends that the reference to "testimony and background" suggests that the redacted text merely concerns past factual events.  In fact, in the document, Ian Solomon, Senior Advisor to the Secretary, poses questions to Treasury staff regarding hypothetical future events and requests consideration of alternative approaches that the agency might take.  The document thus reflects an attempt to clarify issues and provide background to assist decisionmakers in preparing for possible events.  For this reason, the deliberative process privilege applies.

Document 509-511 is an email thread on March 20, 2009, circulating a draft answer and comments in response to a "question concerning AIG Credit Default Swap counterparties."  The source of the question is not apparent from the Vaughn Index or the document itself.  The description provided by Treasury further fails to suggest that any future action might be taken based on the draft question and answer.  Moreover, an in camera review of the document establishes that the question concerned a transaction on November 10, 2008, well before the date of the email.  Since the document merely explains a decision already made, it fails to meet the predecisional requirement and must be released in full.

Document 860-866 is an email thread "circulated for consideration of Treasury decisionmakers" that "discuss[es] potential responses to concerns raised by various market participants related to [a] Congressional inquiry on AIG bonuses."

According to Treasury, the policy issue at hand "was how to ensure market participation in current (and any future) government programs designed to address financial crises." Although Fox contends that the subject line "Contagion" suggests that the emails are concerned with "staying ahead of a story rather than formulating a policy," the actual document confirms Treasury's assertion that it relates to deliberations within the agency about how to ensure market participation in the government's initiatives. The agency's exchange of concerns and suggested approaches falls squarely within the protection of the deliberative process privilege. The privilege consequently is applicable to this document.

Document 1040 is an email thread among Treasury staff discussing "proposed message and themes to convey" in the Secretary's speech to the Council on Foreign Relations, and "providing comments" on a draft of the speech. This record cannot be withheld under the deliberative process privilege because it is neither predecisional nor deliberative. First, the material is predominantly backward-looking and explains decisions that the agency previously had made. Second, the redacted text consists entirely of commentary on the messages and themes to include in the Secretary's speech. Accordingly, the document is concerned with packaging the agency's opinion for the public and must be released in full.

Documents 1041-1042, 1047-1048, 1053-1058 are an email thread among Treasury staff dated March 15, 2009, discussing possible responses to Representative Pelosi's public statement that day criticizing AIG's plan to pay bonuses to its executives.

The redacted portions contain a discussion of suggested courses of action.  Treasury also withheld a draft comment for news outlets that reflected a perspective and tenor ultimately rejected by the agency.  Since the deliberative process is concerned with guarding against premature disclosure of unfinalized policies and is intended to prevent public confusion through the dissemination of documents suggesting rationales not ultimately adopted by an agency, these redactions fall squarely within the ambit of the deliberative process privilege.  Public disclosure of such material is likely in the future to impair the prompt exchange of ideas in response to a developing policy issue.  Treasury therefore properly redacted the document.

Document 1719 is an email containing a draft statement by the Secretary regarding the AIG retention payments.  Although the draft statement itself has been released, Treasury withheld a portion of the email that contains "the author's explanation for why the final version differed from early draft language."  The redacted text, however, relates to the agency's thought process on messaging, rather than substantive policy.  This material is not protected by Exemption 5 and must be released.

Document 2522-2536 is an email thread, dated March 14, 2011, "discussing potential responses to an anticipated announcement regarding a proposed transaction." Treasury withheld portions of the email discussing the agency's potential response to an anticipated letter to the Secretary regarding the transaction from Edward Liddy, then AIG's Chief Executive Officer.  The letter evidently was received shortly after the emails

in question were circulated.  Fox notes that the letter sent by Liddy concerned the propriety of certain employee bonuses paid by AIG.  Fox contends that Treasury has withheld the exchange solely because its disclosure would be embarrassing to the agency. (Mintz May 5 Letter at 5-6).  Fox further argues that the Treasury's description of the document "implicates pure image management, not formulation of policy."  (Annotated Vaughn Index).  A review of the document, however, fails to corroborate Fox's position. Instead, the redacted text discusses proposed courses of action in response to the letter and the possibility that other transactions might take place.  This discussion of how best to approach uncertain and unfolding developments involves deliberation on substantive policy matters; Treasury's privilege claim is therefore proper.

Document 4554-4555 is an email thread among Treasury personnel, including legal staff, that discusses and circulates draft language to be included in AIG's SEC Form 10-K. This document is identical to Document 3778-3779, as to which Treasury properly asserted a claim of attorney-client privilege.  Because Treasury's Revised Vaughn Index does not assert the attorney-client privilege with respect to Document 4554-4555, the only basis for withholding this copy of the document is the deliberative process privilege.  Treasury has withheld, in part, certain comments in the email thread, explaining that they were intended "to assist Treasury decisionmakers" in matters related to the proposed restructuring transaction, "including issues related to AIG's status as a going concern."  Fox counters that providing language for AIG's report on SEC Form 10-K "cannot be predecisional or deliberative from Treasury's point of view."

37

(Annotated <u>Vaughn</u> Index).  The unredacted document establishes, however, that the withheld comments would reveal internal deliberations with respect to policy concerns. The redacted text therefore was properly withheld under the deliberative process privilege.

Finally, Document 8719-8720 is an email thread dated March 29, 2009, concerning a "summary of [a] proposed 2008 bonus plan for investments" to be considered at a Compensation Committee meeting the following day.  Treasury redacted the email and withheld the summary.  Since the communications concern a proposal that was to be placed on a committee agenda for approval, they clearly are predecisional.  As to the deliberative requirement, Treasury states that the withheld summary explains "possible approaches" to aid Treasury in "'decid[ing] how to deal with the particular problems' of AIG's compensation program" in the context of the AIG TARP Restructuring Transaction. The document itself confirms Treasury's assertion that the information withheld was intended to assist decisionmakers in deciding what approach to follow.  It is accordingly protected by the deliberative process privilege.

III.     <u>Conclusion</u>

For the foregoing reasons, Fox's letter-motion for summary judgment, (ECF No. 21), and Treasury's cross letter-motion for summary judgment, (ECF No. 22), both are granted in part and denied in part.

The Court will hold a telephone conference on December 3, 2012, at 3 p.m., to determine whether there are any further issues requiring resolution before this case is closed.  Counsel for Fox should initiate that call.

SO ORDERED.

Dated:     November 26, 2012
           New York, New York

_____
FRANK MAAS
United States Magistrate Judge

Copies to:
All Counsel via ECF

39